UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MARGUERITE S. MEREDITH                          CIVIL ACTION

VERSUS                                          NO. 07-8514

MICHAEL J. ASTRUE, COMMISSIONER                 SECTION "J" (2)
OF SOCIAL SECURITY ADMINISTRATION


**<u>FINDINGS AND RECOMMENDATION</u>**

Plaintiff, Marguerite S. Meredith, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1381a. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

As ordered, plaintiff filed a timely Memorandum of Facts and Law. Record Doc. No. 14. Defendant filed a timely reply memorandum. Record Doc. No. 17.

I.      <u>PROCEDURAL HISTORY</u>

Meredith filed an application for SSI on July 19, 2001, alleging disability since April 20, 1998 based on a long list of symptoms and diagnoses, including degenerative disc disease, osteoporosis, peptic ulcer disease, chronic depression, arthritis, "sugar

intolerance (diabetes)" and migraine headaches. (Tr. 43-45, 84, 93). "Claimants applying to the SSI program may <u>not</u> receive payments for a period predating the month in which they apply for benefits." <u>Rosetti v. Shalala</u>, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335) (emphasis added); <u>accord</u> <u>Brown v. Apfel</u>, 192 F.3d 492, 495 n.1 (5th Cir. 1999). "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid." <u>Hector v. Barnhart</u>, 337 F. Supp.2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; <u>Brown</u>, 192 F.3d at 495 n.1). Therefore, despite plaintiff's claimed onset date of April 20, 1998, the relevant time for any period of disability is July 19, 2001 through the date of the ALJ's decision.

After her application was denied, plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on May 9, 2002. (Tr. 344-74). The ALJ issued a decision denying plaintiff's application on June 14, 2002. (Tr. 7-16). Meredith appealed to this court in Civil Action No. 05-1379. On November 21, 2005, the court granted the Commissioner's unopposed motion to remand the case to the agency for further administrative proceedings. (Tr. 412-19). The Appeals Council remanded the case to the ALJ on January 6, 2006 for another hearing, to develop the record as needed and to issue a new decision. (Tr. 426).

The ALJ conducted additional hearings on September 26, 2006 and March 13, 2007. (Tr. 466-512).[1] He issued a decision denying plaintiff's application on April 25, 2007. (Tr. 386-403). After the Appeals Council denied review on September 8, 2007, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 377-79).

## II. STATEMENT OF ISSUES ON APPEAL

Although plaintiff did not include a separate statement of errors in her memorandum, as ordered by the court, Record Doc. No. 10, she contends that the ALJ made the following errors:

A. The ALJ erred by failing to order additional consultative examinations from a psychiatrist and an orthopedic surgeon.

B. The ALJ was biased, conducted an improper hearing and rendered an unfavorable decision because of his bias.

## III. ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1. Plaintiff has severe impairments of degenerative disc disease of the cervical and lumbar spine; osteoporosis; and a history of peptic ulcer disease, status post surgery for perforated duodenal ulcer.

---

[1]The transcript of the September 2006 hearing was inadvertently omitted from the certified record originally filed with the court. Record Doc. No. 9. The Commissioner supplemented the record with the September 2006 hearing transcript. Record Doc. No. 18.

2.     Meredith's complaints of knee and joint pain are found to be "not medically determinable" because they are not specifically noted anywhere in the medical evidence.

3.     Her depression, with or without psychotic features, and possibly generalized anxiety disorder are not supported by the medical evidence and are not severe.

4.     Plaintiff has the residual functional capacity to perform sedentary work with the following restrictions: lifting and/or carrying no more than ten pounds occasionally and less than ten pounds frequently; standing and/or walking in one hour intervals, for a total standing and/or walking no more than two hours in an eight-hour day; sitting no more than six hours in an eight-hour day; the ability to alternate positions periodically; occasional climbing on a ladder, rope or scaffold; occasional stooping, crouching or crawling; and occasional overhead work.

5.     Her testimony concerning the intensity, persistence and limiting effects of her symptoms was not entirely credible and was not corroborated by the medical evidence.

6.     Meredith can perform her past relevant work as an accounting clerk, time keeper and secretary.

(Tr. 388-90, 402-03).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir.

4

2005); <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002); <u>Loza v. Apfel</u>, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Perez</u>, 415 F.3d at 461; <u>Loza</u>, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Id.</u>

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  <u>Perez</u>, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  <u>Id.</u>; <u>Newton</u>, 209 F.3d at 452; <u>Martinez v. Chater</u>, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2007). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[2] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Perez, 415 F.3d at 461.

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (2007) ("Medical-Vocational Guidelines").

The claimant has the burden of proof under the first four parts of the inquiry. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.     Factual Background

At the first hearing on May 9, 2002, plaintiff testified that she has an associate's degree in business management from Delgado Community College. (Tr. 353). She stated that she last worked in 1998 for a company that performed oilfield pipe inspections, for which she collected the daily inspection reports and did the accounting work. (Tr. 354). Plaintiff testified that she had worked as a hostess, cocktail waitress and bartender part-time for seven years until 1986, in addition to her full-time accounting job with a different inspection engineering company. (Tr. 370-71, 483-84). She said that she went back to school full time in 1995. (Tr. 370-71).

Meredith testified that she was laid off in 1998. She said she had looked for another job, but could not remember when she stopped looking. She stated that she really was not able to work at that time because she was always having problems.

Plaintiff said she had received some mental health treatment off and on for about five years, but had not received any such treatment in the last couple of years. She testified that she had gone to the Metairie Mental Health Clinic while she was working for the inspection company, but that sometimes she would have to wait for hours even though she had an appointment, and she could not take so much time off from work. (Tr. 355-56). Meredith stated that she also stopped going to the clinic because she did not like the doctor, and that she could not afford private services. She said she had decided in the past month, without any prompting from her attorney, to seek mental health treatment. She testified that she had seen Dr. Ancira recently at the suggestion of a friend, and that he was going to let her pay a little bit at a time. (Tr. 356). When the ALJ asked why she had not gone to West Jefferson or East Jefferson Mental Health Clinic, she explained that she had previously gone there for years, but that the waiting time was too long and she cannot sit for long periods. She stated that she did not like the doctor there because he kept asking her whether she wanted to commit suicide. (Tr. 357).

Meredith testified that she takes Prevacid and Zantac, which were prescribed by Dr. James Maher, for her ulcers; she takes Vicodin ES and Soma, which were prescribed

by Dr. LoCoco, for her back pain; and she has just started taking Zoloft, which was prescribed by Dr. Ancira. (Tr. 357-58).

Plaintiff said that she does not do a lot in a typical day. Specifically, she stated that, when she gets up in the morning, she cleans up the dishes from the night before, then takes a bath and decides what to feed her son for dinner. (Tr. 358). She testified that she lives with her 15-year-old son. She said she lies down a lot and watches television because she cannot move around or bend over because of the pain caused by those movements. (Tr. 359). She stated that she is able to pick up small things around the house to keep it clean, but that her son takes out the trash, does the vacuuming and takes care of anything that needs to be moved. (Tr. 360). She testified that she used to cook every night because she enjoyed cooking, but now she is unable to cook more than once a week, when she will make enough of one thing to last several days. (Tr. 360-61). She said that she and her son eat a lot of sandwiches and frozen foods.

Meredith stated that she has problems with her short-term memory. She testified that Dr. LoCoco has told her she is not a candidate for surgery. (Tr. 361). She said that her peptic ulcer disease was discovered in July 2000 after she went to the East Jefferson Hospital emergency room with bad stomach pains, constant diarrhea and vomiting. She stated that she was admitted for emergency surgery and stayed in the hospital for nine days. She testified that her ulcers recur about once a month and that, when she has a

spell, as she had during the preceding three days, she has daily diarrhea, is unable to eat and vomits for a couple of days. (Tr. 362).

Concerning her spinal problems, plaintiff said she is in "very severe" pain "all the time," so she just stays home. (Tr. 362-63). She stated that she has continual muscle spasms, which cause severe pain, even when taking medication. She said that the medication makes her drowsy and that she cannot take anti-inflammatory drugs because of her peptic ulcer disease. She stated that she is not supposed to and cannot pick up more than three to five pounds at a time. (Tr. 363). She said she cannot stand or sit for more than 20 to 30 minutes because of muscle spasms and severe pain. (Tr. 363-64).

Meredith stated that she cannot sit for long periods, even if she could move about periodically, because of the "excruciating pain" in her neck and lower back. She said she cannot climb a ladder or keep her hands in position over a calculator or keyboard. She stated that she wishes she could work, because she finds it therapeutic, and that she had worked all her life from age seventeen, but that she is unable to work. (Tr. 369-70).

Plaintiff testified that she smokes cigarettes. She said that she was unemployed when she went to the East Jefferson Hospital emergency room in June 2001. (Tr. 372). She stated that, if the medical records for that visit say that she was employed as a secretary at that time, it is incorrect, and that perhaps the hospital had picked up that information from the records of a prior hospitalization. (Tr. 372-73).

Plaintiff's sister, Melanie Giorlando, was available to testify at the first hearing. Plaintiff's attorney made an offer of proof that Giorlando would corroborate Meredith's testimony about her pain, symptoms and limitation of activities. (Tr. 364).

At the second hearing, held on September 26, 2006, Meredith testified that she had evacuated to Alexandria, Louisiana for Hurricane Katrina and had stayed there until residents were permitted to return to Metairie. She said that her home was destroyed by the hurricane and that she now lives in a FEMA trailer in her mother's front yard. (Tr. 499-500). She stated that she had not yet applied to the Road Home Program.

The ALJ limited his questions to the period from the May 2002 hearing until Hurricane Katrina. Plaintiff said that she had neither sought nor received any mental health treatment during that time. (Tr. 500-01). She said she did not know that there had been a free mental health clinic at East Jefferson Hospital before the hurricane. She also testified that she had not had either transportation or funds to seek treatment. She stated that she now smokes about one-half pack of cigarettes per day, having cut back from smoking two packs per day for the past four to five years. (Tr. 501-02). She testified that a pack of cigarettes costs between $3.50 and $3.80. (Tr. 502). She agreed with the ALJ's calculation that she had spent about $215 per month on cigarettes when she smoked two packs per day. She stated that she is trying to quit smoking. (Tr. 505).

Meredith testified that she tries not to watch television during the day because it is a bad habit, and that she tries to read instead. (Tr. 502). She said her son is 19 years old and still lives with her, but that he is considering going to work offshore. (Tr. 502-03). She said that, on a typical day before the hurricane, she would make sure the bathroom and kitchen sink were clean, wash a few dishes and watch television. (Tr. 503). She stated that she went grocery shopping about every two weeks and that she would drive herself to a grocery store if her car was running, or get a ride from her sister or someone else. She testified that her sister is now living at her mother's house. (Tr. 504).

Plaintiff stated that she has not had any additional medical treatment since 2002, other than that documented in the few medical records from Doctors' Hospital, dated December 20, 2002, March 20, 2003 and September 9, 2003, that her attorney submitted at the hearing. (Tr. 505, 497). She said she needs to see a lot of doctors, but she cannot because she cannot afford it. (Tr. 505).

Meredith testified that she needs to see a doctor about her anemia because she has to give blood about every four months. She also stated that she needs to see a mental health doctor to get some antidepressants because she does not feel that there is any use in waking up each day. She clarified that she goes to the hospital emergency room about

every four months and has blood drawn to have her anemia checked.  She stated that she did the same thing before the hurricane after she was diagnosed with anemia.  (Tr. 506).

Plaintiff testified that she has been diagnosed with emphysema. (Tr. 506-07).  She said she is very easily winded and cannot walk more than one block or do anything strenuous because of her pulmonary disease and because of her back.  She stated that she still has trouble with her neck and back.  She said that her peptic ulcer disease still causes vomiting and diarrhea and that she cannot be far away from a bathroom at any time because she usually has one or the other.  (Tr. 507).  She said that these symptoms improve from time to time, but then will appear again.  She testified that she had emergency surgery for a perforated ulcer and peritonitis before the last hearing.  She said she understood that the ulcer causes bile, which caused her to have a hiatal hernia that makes swallowing difficult, and she does not think there is a remedy for it.  (Tr. 508). She stated that she has chronic depression.

Meredith testified that she would like to work, but she would have to set up her computer in the bathroom because of the constant diarrhea and vomiting.  She said she feels overwhelmed and helpless every day.  (Tr. 509).  She stated that, after the last hearing and before the hurricane, she took medicine for her ulcer, but that it cost about $300 per month and she cannot afford it now.  She testified that her spine condition has gotten worse since the last hearing, but that her activities since the hearing were about

the same as before the hearing. (Tr. 510). She said that her teeth are rotting because of the vomiting from the ulcers. (Tr. 510-11). She stated that she has not seen any doctors or taken any medications in the last couple of years.

At the end of the hearing, the ALJ told plaintiff that he would send her to see an internist and a psychiatrist and would await their reports, then probably have another hearing, before rendering a decision. (Tr. 511-12).

At the third hearing on March 13, 2007, Meredith testified that she had not worked or looked for work since the last hearing. (Tr. 468). She said she had not received any mental health treatment since seeing Dr. Cohen (the consultative psychiatrist). She stated that she had contacted Metairie Mental Health Clinic, where she had been a patient at one time, but was told that they were not seeing any patients who had not been hospitalized before the hurricane. She said she had asked Dr. Cohen if he knew of any place that she could go, but he did not know. She testified that she is not seeing any physicians or taking any medications now, and that the last time she saw a doctor was before the hurricane. She stated that she has not gone to any of the clinics around the New Orleans area since the hurricane because she does not have transportation. (Tr. 469).

Plaintiff said she still lives with her son in Metairie in a FEMA trailer in her mother's yard. She said her son is 20 years old and had gone to work offshore that morning. She said he would be gone for two weeks at least, and might have an option

14

to stay offshore for a month.  She stated that she still smokes one-half pack of cigarettes per day.  (Tr. 470-71).  She testified that her activities are about the same as she described at the last hearing, except that she does not go to the grocery store quite as much because of financial reasons.  She stated that she sees her sister, who lives in an apartment about seven minutes away, once or twice a week.  (Tr. 471-72).

Plaintiff said that she cannot lift or carry twenty pounds occasionally or ten pounds frequently, and that she was told years ago not to lift more than three to five pounds.  She said she is not supposed to sit for more than one-half hour at a time and that her ability to push and pull is affected by her impairments.  (Tr. 473-74).  She testified that she feels like a very useless person.  She said that she is limited in her ability to reach because of muscle spasms and the disc in her back, and that she cannot reach or handle things on a frequent basis or for a substantial part of an eight-hour day.  She stated that she has cervical and lumbar disc problems, fibromyalgia, scoliosis and osteoporosis.  (Tr. 474-75).  She testified that she still has symptoms from her peptic ulcer disease, including vomiting and diarrhea.  She said she has to go to East Jefferson Hospital and give three to four units of blood every six months.  (Tr. 476-77).

C.    <u>Vocational Expert Testimony</u>

A vocational expert, Todd Capielano, testified at the third hearing that the jobs of accounting clerk and secretary are sedentary, skilled work, while a timekeeper job is sedentary and semi-skilled.  He stated that bartender, hostess and cocktail waitress are light, semi-skilled jobs.  (Tr. 485).

The ALJ posed a hypothetical of a younger individual with the same work history and education as Meredith who can lift and/or carry no more than ten pounds occasionally and less than ten pounds frequently; stand, bend or walk no more than two hours in an eight-hour day, and stand and/or walk no more than one hour at a time; sit for at least six hours in an eight-hour day, with the ability to alternate sitting and standing periodically; occasionally stoop, crouch, crawl or climb on a ladder, rope or scaffold; occasionally engage in overhead work; is moderately limited in her ability to interact appropriately with the public and with co-workers; and is moderately to markedly limited in her ability to interact appropriately with supervisors, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting.  (Tr. 485).  The vocational expert testified that such a person would have a difficult time maintaining employment because of the moderate to marked inabilities to deal with supervisors and to respond to work pressures and changes in routine.  He

stated that maintaining employment for more than three to six months would be difficult for such an individual.  (Tr. 487).

The ALJ then deleted from the hypothetical all of the moderately and moderately to markedly limited abilities to handle work stressors, but kept the same physical limitations.  With those deletions, Capielano testified that the person could perform all of the past relevant sedentary jobs, but not the light duty ones.

The ALJ posed a third hypothetical that had the same physical limitations, but included moderate limitations in the person's ability to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting.  The vocational expert testified that such an individual probably would not be able to maintain employment for more than six months to a year.  (Tr. 488).

Although plaintiff's attorney was given an opportunity to cross-examine Capielano, he decided not to ask any questions after being cautioned by the ALJ that he must pose only hypothetical questions.  (Tr. 488-89).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 390-96).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ was not required to order additional consultative examinations.

Plaintiff argues that the ALJ erred by failing to order additional consultative examinations by a psychiatrist and an orthopedic surgeon.  She contends that the November 29, 2006 report of consultative psychiatrist Alvin Cohen, M.D., was internally inconsistent, and that another psychiatrist, Robert Ancira, M.D., who examined her on April 2, 2002, found that she was not a candidate for employment because of her depression.  Meredith argues that the ALJ should have ordered another psychiatric examination to resolve these conflicts in the evidence.  She also asserts that the ALJ should have obtained a consultative examination from an orthopedic surgeon to evaluate her spinal conditions.

Meredith has the burden of proving her disability with sufficient medical evidence. Reynaud v. Astrue, 226 Fed. Appx. 401, 2007 WL 1119188, at *1 (5th Cir.), cert. denied,

128 S. Ct. 324 (Oct. 1, 2007) (citing <u>Wren v. Sullivan</u>, 925 F.2d 123, 128 (5th Cir. 1991)).  If she was unable to provide sufficient medical evidence, the ALJ may make a decision based on the information available.  <u>Id.</u>

The decision to obtain a consultative examination is within the ALJ's discretion.  A consultative examination must be ordered only when "<u>necessary</u>" to develop a full and fair record.  <u>Id.</u> (citation omitted).  "To determine whether the ALJ fully and fairly developed the record, we ask whether the record contained sufficient evidence for him to make an informed decision.  So long as such evidence exists, the ALJ need not have supplemented the record with additional evidence."  <u>Hernandez v. Astrue</u>, 269 Fed. Appx. 511, 2008 WL 687288, at *3 (5th Cir. 2008) (citations omitted).

In addition to the reports from Drs. Ancira and Cohen, the ALJ considered a consultative examination by psychiatrist Carmen Ramos, M.D., dated December 12, 2000[3] (Tr. 121-24), and a Psychiatric Review Technique form completed by Lester Barnett, Ph.D., on December 12, 2001, based on his review of the record.  (Tr. 309-22).  Drs. Ramos and Barnett both concluded that plaintiff could work despite her history of depression.

---

[3]Although this was seven months before the date when plaintiff could obtain SSI benefits, it is relevant because it was within the twelve-month period necessary to establish a disabling impairment. 42 U.S.C. § 423(d)(1)(A).

Dr. Ancira saw plaintiff once. He conducted no tests, recorded no observations and reported no results of either a physical or a mental status examination. He concluded that Meredith could not work based on her self-reported "multiple medical problems which would only exacerbate her condition," rather than on any specific mental health or other functional limitations that he found. (Tr. 341). It is well established that a physician's statement that a patient cannot work does not mean that the patient is disabled for purposes of the Act, because that is a determination that may be made only by the Commissioner. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003) (citing 20 C.F.R. § 404.1527(e), (1) & (e)(3)).

The ALJ rejected the opinion of Dr. Ancira because plaintiff saw him only once and his report was inconsistent with the other medical evidence of record. The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. Newton, 209 F.3d at 455. Any physician's opinion may be assigned little or no weight when the "evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." Id. at 456. The ALJ properly rejected Dr. Ancira's opinion under this standard.

The ALJ sent plaintiff to Dr. Cohen for a psychiatric examination. She argues that another consultative examination is needed because Dr. Cohen's opinion is internally inconsistent. She states in her memorandum that Dr. Cohen diagnosed her with a major

depressive disorder with psychotic features (Tr. 445), and that he inconsistently said that she has no significant impairment in her ability to work.  However, her summary of his findings is incomplete.  A review of his entire report reveals that his conclusions were not inconsistent.

Dr. Cohen examined Meredith, reviewed some prior medical reports supplied by the Commissioner, rendered a comprehensive narrative report and completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental).  He noted in his report that plaintiff thinks that people are talking about her and that she hears the voices of demons telling her that she is no good.  Dr. Cohen opined on the Medical Source Statement that her psychotic features (paranoia and auditory hallucinations) did not impair her ability to understand, remember and carry out instructions.  This is consistent with his narrative findings that Meredith communicated with and related to him responsively and adequately, and that she had adequate memory, intelligence, concentration and attention.  He also opined on the Medical Source Statement that she was moderately impaired in her ability to interact appropriately with co-workers and the public, and that she was moderately to markedly impaired in her abilities to interact appropriately with supervisors, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting.  (Tr. 446-

47). These opinions are consistent with his findings concerning her depression, auditory hallucinations and paranoia.

Dr. Cohen's report as a whole was consistent. My review of the entire record reveals that the ALJ had sufficient information on which to make an informed decision concerning plaintiff's mental health impairment. No additional psychiatric evaluation was necessary for the ALJ to make an informed decision.

Next, plaintiff argues that the ALJ should have obtained a consultative examination from an orthopedic surgeon after receiving the consultative examination report from John F. Nitsche, M.D., an internist with a specialty in rheumatology. On November 23, 2006, Dr. Nitsche found that Meredith has x-ray evidence of spurring and degenerative arthritis in her cervical and lumbar spine. (Tr. 450-53). He also completed a form Medical Source Statement of Ability to Do Work-Related Activities (Physical), in which he found that plaintiff had limited abilities to lift and carry more than ten pounds and some limitations on environmental exposures because of her chronic obstructive pulmonary disease, but no limitations on walking, standing, sitting, pushing, pulling or reaching. (Tr. 456-59). The ALJ incorporated these limitations into his residual functional capacity findings. Meredith contends that she should have been evaluated by an orthopedic surgeon in light of Dr. Nitsche's diagnosis and other record

evidence that she has bulging discs, spondylosis[4] and scoliosis.[5]  However, no additional

evaluation was necessary precisely because of the depth of the record evidence.

The ALJ found that plaintiff has severe impairments of degenerative disc disease

of the cervical and lumbar spine and osteoporosis[6] and that she was limited to sedentary

work with the additional restrictions noted in his findings.  Dr. Nitsche's opinions were

consistent with prior diagnostic tests and reports from plaintiff's treating physicians and

other consultative examiners.  Her treating orthopedist, Santo LoCoco, M.D., diagnosed

cervical disc syndrome, scoliosis and osteoporosis based on x-ray and MRI evidence of

a collapsed or bulging disc and bone spur formation in her cervical spine.  He opined on

November 26, 2001 that Meredith could perform sedentary work with some restrictions

on lifting, standing and walking.  (Tr. 277-78).

Dr. LoCoco referred plaintiff to a neurosurgeon, John F. Schumacher, M.D., who

examined her on March 21, 2001.  Dr. Schumacher characterized Meredith's cervical

MRI results as "essentially normal" and he diagnosed mild cervical degenerative disease.

---

[4]Spondylosis is a generic term for "any of various degenerative diseases of the spine."  Medline Plus, avail. at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

[5]Scoliosis is "a lateral curvature of the spine."  Id. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=scoliosis.

[6]Osteoporosis "is characterized by decrease in bone mass with decreased density and enlargement of bone spaces producing porosity and brittleness."  Id. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=osteoporosis.

He opined that surgical intervention was not needed and he recommended relaxation techniques and neck exercises.  (Tr. 287-88).

Two other consultative physicians, Mary Mathai, M.D., a specialist in physical medicine and rehabilitation, and internist Dr. Doyle, examined plaintiff on January 21, 2001 (about six months before plaintiff's relevant disability date) and November 19, 2001, respectively.  (Tr. 279-83, 290-92).  Both doctors diagnosed degenerative disc disease and restricted plaintiff only from heavy work.  Thus, the ALJ had sufficient medical information upon which to base an informed decision concerning Meredith's back and neck impairments.

Finally, even if the ALJ erred by failing to obtain additional consultative examinations, the court "will not reverse the decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure.  To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result."  Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000) (quotation and citations omitted).  Meredith has not demonstrated how another consultative examination, either psychiatric or orthopedic, would have changed the ALJ's decision.

Accordingly, this assignment of error lacks merit.

2.    <u>The record contains no evidence that the ALJ was biased</u>.

Meredith argues that the ALJ conducted an improper hearing and issued a biased decision because he selected a personal friend, Alan Klein, M.D., to testify as a medical expert at the third hearing.  She speculates that the ALJ "wanted to stack the cards in his favor by . . . selecting his friend to be a witness.  Apparently he wanted to justify his previous unfavorable decision so he chose his friend to help him do another unfavorable decision[.]"  Plaintiff contends that, after her attorney questioned Dr. Klein, the ALJ became antagonistic to her attorney and unfairly restricted his questioning of the vocational expert.  She argues that "these irregularities" tainted the hearing process and demonstrated the ALJ's bias, so that a new hearing is required before a different ALJ.  Record Doc. No. 14, at pp. 2-3.  The record does not support plaintiff's argument.

At the third hearing, the ALJ asked Dr. Klein if their social relationship would in any way compromise the doctor's ability to be objective and impartial, and Dr. Klein testified that it would not.  (Tr. 477).  The ALJ stated that he and Dr. Klein are personal friends and that they had not discussed Meredith's case.  The ALJ told counsel that he could explore that personal connection by questioning Dr. Klein and that he was free to object to Dr. Klein testifying.  The ALJ said he did not care if plaintiff's attorney asked questions or objected to Dr. Klein appearing as a witness.  (Tr. 478).  The ALJ explained that he sees Dr. Klein socially "fairly regularly," meaning a couple of times per week,

and that they are neighbors. (Tr. 479). Dr. Klein testified that, in the ten years that he has known the ALJ, he has never discussed with the ALJ a Social Security case in which he would participate in a hearing, and that he had not done so in this case. Dr. Klein stated that he and the ALJ "have a very strong barrier in terms of" discussing his testimony.

After these explanations, plaintiff's attorney asked for a second time whether Dr. Klein lived next door to the ALJ. The ALJ stopped Dr. Klein from answering and told the attorney that "we're going to make this real easy because you're being kind of infuriating." The ALJ told Dr. Klein that his testimony would not be needed and that he was free to go. When the attorney responded that Dr. Klein was free to testify, the ALJ said that Dr. Klein would not testify and that the attorney had "managed to poison the well because I see where you're going to go and I don't like it." Meredith then asked if this exchange would have any reflection on her. The ALJ responded that it would not, that he would judge the case fairly, that it reflected only on her attorney, not on her, and that he "never take[s] anything out on claimants." (Tr. 480). Dr. Klein did not testify.

Capielano, the vocational expert, testified next. When the ALJ posed his first hypothetical question, plaintiff's attorney objected that it assumed facts that were contradicted by Meredith's testimony. The ALJ denied the objection and told him that he would have an opportunity to ask his own hypothetical questions. (Tr. 486). When

plaintiff's attorney was given the chance to cross-examine Capielano, he asked an improper question and the ALJ stopped him. The ALJ noted that he had instructed the attorney about the proper way to ask hypothetical questions of a vocational expert at the first hearing, and told him again that he must "ask his questions in the form of limitations in areas of functioning and exertional limitations, and expressed in terms of frequency and duration. So why don't you do that?" Plaintiff's attorney then stated that he had no more questions. (Tr. 488-89).

Earlier during the third hearing, the ALJ had cautioned the attorney to stop asking Meredith questions that put her in the position of quarreling with the diagnoses made by the medical doctors and told him that he should ask her what she could and could not do. (Tr. 475). Similarly, at the second hearing, the ALJ had directed the attorney to stop "testifying for" plaintiff and instead to ask her open-ended questions that would let her explain how her symptoms affected her functioning. (Tr. 509). In the first hearing, as the ALJ mentioned at the third hearing, plaintiff's counsel had posed improper questions to the vocational expert, and the ALJ had instructed counsel that he needed to pose hypothetical questions that quantified the claimant's limitations in particular areas of functioning. (Tr. 366-67). The ALJ had also warned plaintiff's attorney at the first hearing concerning his inappropriate manner of questioning Meredith. (Tr. 369-70).

These exchanges, whether viewed singularly or collectively, do not demonstrate bias sufficient to overturn the ALJ's decision. "'[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge' unless 'they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.'" Brown, 192 F.3d at 500 (quoting Liteky v. United States, 510 U.S. 540, 555 (1994)); accord Bayliss v. Barnhart, 427 F.3d 1211, 1215-16 (9th Cir. 2005) (citing Liteky v. United States, 510 U.S. at 555-56); Brown, 192 F.3d at 500; Puckett v. Chater, 100 F.3d 730, 734 (10th Cir. 1996); Ginsburg v. Richardson, 436 F.2d 1146, 1151 (3d Cir. 1971)). The record in this case does not support a finding that such a high degree of favoritism or antagonism existed.

Accordingly, this assignment of error lacks merit.

<u>CONCLUSION</u>

The ALJ did not err by failing to order additional consultative examinations from a psychiatrist and/or an orthopedic surgeon. The evidence does not demonstrate that the ALJ was biased, conducted an improper hearing or rendered an unfavorable decision because of any bias.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __26th__ day of January, 2009.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE